**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

-------------------------------------------------------x

**DAVID FERNANDO AYAVACA TENEMEA,**

Petitioner,

v.

**RAUL MALDONADO, JR., et al.,**

Respondents.

-------------------------------------------------------x

**Case No. 26-CV-4001 (SJB)**

## PETITIONER'S REPLY MEMORANDUM OF LAW IN FURTHER SUPPORT OF THE PETITION FOR A WRIT OF HABEAS CORPUS

## PRELIMINARY STATEMENT

Respondents ask the Court to dismiss this case without ever producing the records that would show whether David Fernando Ayavaca Tenemea was lawfully arrested, whether his prior release was lawfully revoked, or whether ICE ever made the individualized custody decisions it now says occurred. The opposition relies instead on three procedural labels: wrong district, removal-order challenge, and abuse of the writ. None fits the record.

The venue objection begins with a factual conflict that cannot be resolved against Petitioner on a lawyer's memorandum. The petition was filed at 6:41 p.m. on July 2, 2026. Counsel had received no notice that ICE had moved Mr. Ayavaca from MDC Brooklyn. At approximately 7:47 p.m., ICE's own Online Detainee Locator still reported: "State: NY" and "Current Detention Facility: BROOKLYN MDC." Ex. A. The Government now says that, without notice, it had transferred him to New Jersey and booked him there at approximately 2:00 p.m. Opp. 4–6. That secret-transfer dispute falls squarely within this Court's reasoning in *Flores-Linares v. Bondi*, No. 26-CV-298 (SJB), 2026 WL 179208, at *4–5 (E.D.N.Y. Jan. 22, 2026), and the unknown-custodian rule recognized in *Ozturk v. Hyde*, 136 F.4th 382, 392–93 (2d Cir. 2025).

The abuse-of-the-writ argument fares no better. Prior counsel expressly argued that ICE's custody reviews were "perfunctory, non-individualized," lacked any analysis of danger or flight

risk, ignored alternatives to detention, and denied Mr. Ayavaca a meaningful opportunity to contest confinement. SDNY Reply 9–11, *Ayavaca Tenemea v. Noem*, No. 25-CV-9066 (PMH), Dkt. 18 (S.D.N.Y. Mar. 9, 2026). The Southern District did not decide that claim. Its eight-page opinion addressed a different question: whether the then-operative T-visa stay made removal unforeseeable under *Zadvydas*. Dkt. 19 at 5–8. A claim raised but not adjudicated is not a claim adjudicated on the merits.

The present record also exposes defects the earlier case could not resolve. ICE says Mr. Ayavaca was released on recognizance under 8 U.S.C. § 1226(a), then re-arrested at a required check-in because "there was no longer a lack of bed space." Charles Decl. ¶¶ 7, 10–11 (Dkt. 10). It names three 2025 review dates and one interview, but supplies no decision, worksheet, notice, reasons, service record, danger evidence, flight-risk analysis, or review after June 2025. Id. ¶¶ 21–23. After more than twenty months of civil confinement, a recital that reviews happened is not the same thing as proof that lawful reviews occurred. The Court should reject the threshold defenses, require the actual custody record, and grant the writ.

## I. THE PETITION WAS PROPERLY FILED IN THIS DISTRICT

The Government concedes that Mr. Ayavaca was confined at MDC Brooklyn for days before filing and remained there during the morning of July 2. Opp. 4–6. It asks the Court to make venue turn on its assertion that he crossed a district line hours before the petition was filed, even though ICE gave counsel no notice and its official locator continued to identify Brooklyn MDC after filing.

That is the problem this Court addressed in *Flores-Linares*. There, ICE secretly moved the petitioner from this District to New Jersey and argued that a nine-minute difference defeated venue. The Court rejected a "minute-by-minute, second-by-second evaluation" and held that a detainee's presence in this District on the filing date was not erased because he spent "a fraction of

the day confined elsewhere." 2026 WL 179208, at *4. The Court also applied *Ozturk*'s unknown-custodian principle: when counsel cannot learn a detainee's new location through reasonable inquiry, counsel may file in the last known district based on the information reasonably available. Id. at *5; see *Ozturk*, 136 F.4th at 392–93.

The same rule controlled in *Valdes Acevedo v. Nassau County Correctional Center*, No. 26-CV-250 (NJC), slip op. at 3–4, 17–20 (E.D.N.Y. Jan. 24, 2026). The court held that *Ozturk* did not "green light" a rule tying venue to the unidentified district through which ICE happened to be transporting a detainee at the minute of filing. Where counsel had no reasonable way to discover the transfer, the last known district—EDNY—was "the one and only judicial district" available. Id. at 4.

The evidence here is stronger. Counsel did not merely rely on a family report. ICE's own public locator affirmatively represented that Mr. Ayavaca was in New York at Brooklyn MDC at 7:47 p.m., more than an hour after filing. Ex. A. The Government offers no locator history, transfer notice, booking record, transport log, or declaration from a person with personal knowledge explaining why the public system contradicted its litigation position. Its "approximately 2:00 p.m." assertion cannot be treated as conclusive while the records remain withheld. See *Flores-Linares*, 2026 WL 179208, at *5 (rejecting reliance on an approximate, hearsay-based transfer account where exact timing supposedly controlled).

Venue is proper. At minimum, the conflict requires a focused evidentiary hearing and production of the transfer and locator records. And if the Court ultimately concludes that New Jersey was the only permissible district, the remedy should be transfer under 28 U.S.C. § 1631 or § 1406(a), not dismissal of a liberty claim on the merits.

## II. THIS IS A DETENTION CASE, NOT REVIEW OF A REMOVAL ORDER

This petition does not ask the Court to vacate, reopen, or review the removal order. It asks whether ICE lawfully arrested and continues to imprison Mr. Ayavaca. The requested remedy is release from custody, not immigration status.

### **Sections 1252(a)(5), 1252(b)(9), and 1252(g) Do Not Bar This Court From Reviewing the Legality of Petitioner's Arrest and Detention**

The Government's jurisdictional argument is foreclosed by the Second Circuit's decision in *Öztürk v. Hyde*, 136 F.4th 382 (2d Cir. 2025), and by Judge Chen's recent application of that binding decision in *De La Rosa Izaguirre v. Mullin*, No. 26-CV-2911 (PKC), slip op. at 10–19 (E.D.N.Y. July 13, 2026). Like Mr. Ayavaca, the petitioner in *De La Rosa Izaguirre* was subject to a final order of removal and was allegedly detained under 8 U.S.C. § 1231. Judge Chen nevertheless rejected the Government's materially identical contention that §§ 1252(a)(5), 1252(b)(9), and 1252(g) deprived the district court of jurisdiction to examine whether ICE had followed the constitutional, statutory, and regulatory requirements necessary to arrest and detain him.

As *De La Rosa Izaguirre* explains, the jurisdictional inquiry turns on "the substance of the relief that a plaintiff is seeking." *Id.* at 13 (quoting *Öztürk*, 136 F.4th at 400). Jurisdiction exists where the petitioner "seeks release from detention," rather than judicial review of the removal determination itself. *Id.* Here, Petitioner does not ask this Court to vacate, reopen, or adjudicate the validity of the removal order. He asks the Court to determine whether ICE lawfully arrested him, lawfully revoked his prior release, and lawfully confined him for nearly two years without a contemporaneous individualized custody determination. Those claims can be resolved without reviewing or disturbing the removal order.

The Government's theory—that detention is insulated from review whenever detention facilitates removal—is precisely the theory rejected in *Öztürk*. As Judge Chen explained:

The Second Circuit rejected the government's argument that "because [the petitioner's] constitutional arguments under the First and Fifth Amendments relate[d] to her detention, and because detention itself is 'necessary for . . . removal proceedings,' [Section] 1252(b)(9) strips district courts of jurisdiction."

*De La Rosa Izaguirre*, slip op. at 12–13 (quoting *Öztürk*, 136 F.4th at 399). The Second Circuit instead held that unlawful-detention claims remain reviewable when they "may be resolved without affecting pending removal proceedings." *Id.* at 13 (quoting *Öztürk*, 136 F.4th at 399). Even where such claims bear some factual relationship to removal proceedings, they do not themselves challenge those proceedings, and therefore § 1252(b)(9)'s "channeling function has no role to play." *Id.*

That reasoning applies with even greater force here. The Court need not decide whether Petitioner is removable, whether his removal order is valid, whether USCIS should approve his T-visa application, or whether ICE may eventually execute the order. The Court need decide only whether ICE complied with the law when it took a person who had been released on recognizance, had complied with supervision, had no criminal history, and had appeared for a required check-in, and placed him in detention without any documented finding of danger, flight risk, noncompliance, or changed circumstances warranting confinement.

*De La Rosa Izaguirre* also draws the controlling distinction between an impermissible challenge to the Government's decision to execute a removal order and a permissible challenge to the manner in which the Government arrested and detained the person:

"[D]istrict courts in this Circuit have distinguished between challenges to ICE's discretion to execute a removal order, which are barred, and challenges to the manner in which ICE executes the removal order, which are not."

*Id.* at 14 (quoting *Ceesay v. Kurzdorfer*, 781 F. Supp. 3d 137, 152 (W.D.N.Y. 2025)). Petitioner's claims fall squarely on the reviewable side of that line. He challenges the absence of a lawful warrant at the time of arrest, the unexplained revocation of his recognizance release, the absence of an individualized custody assessment, ICE's failure to consider his trafficking-victim status, and the absence of any contemporaneous evidence that detention was necessary.

Judge Chen likewise rejected the Government's reliance on *Delgado v. Quarantillo*, 643 F.3d 52 (2d Cir. 2011), the same authority invoked here. *Delgado* involved a plaintiff seeking to compel adjudication of an I-212 application—a request that would have indirectly undermined the reinstated removal order. *De La Rosa Izaguirre*, slip op. at 14. By contrast, *Öztürk* clarified that the result is different where "the claims are based on unlawful detention and the requested relief is release, not review of the order of removal." *Id.* at 15. That is this case. Petitioner seeks release from detention because the detention was imposed and continued without the process required by law. He does not seek review of the removal order.

The Government's remaining authorities do not justify a different result. Judge Chen distinguished *Villatoro v. Noem*, No. 25-CV-5306 (OEM), 2025 WL 2880140 (E.D.N.Y. Oct. 9, 2025), and *Sauceda Henriquez v. Noem*, No. 25-CV-7023 (LDH), 2026 WL 111665 (E.D.N.Y. Jan. 15, 2026), because the petitioners there expressly sought stays of removal—the precise relief Congress channeled to the courts of appeals. *De La Rosa Izaguirre*, slip op. at 15. Petitioner here seeks no such review. And as to the other district-court decisions cited by the Government, Judge Chen declined to follow them because they did not address the Second Circuit's controlling analysis in *Öztürk*. *Id.* at 15–16.

The better-reasoned Eastern District decisions uniformly hold that §§ 1252(a)(5) and 1252(b)(9) do not bar review where a petitioner challenges unlawful arrest and detention rather than the removal order itself. See *Zhang v. Genalo*, 814 F. Supp. 3d 307, 320 (E.D.N.Y. 2025);

*Flores v. Mullin*, No. 26-CV-1855 (GRB), 2026 WL 948298, at *2–3 (E.D.N.Y. Apr. 8, 2026); *D.J.R.R. v. Genalo*, No. 26-CV-3124 (AMD), 2026 WL 1746716, at *2–3 (E.D.N.Y. June 17, 2026); *Diallo v. Lyons*, No. 26-CV-3364 (NRM), 2026 WL 1791494, at *4–5 (E.D.N.Y. June 22, 2026). As Judge Chen concluded, the Government's interpretation of §§ 1252(a)(5) and 1252(b)(9) "sweeps too broadly." *De La Rosa Izaguirre*, slip op. at 16.

Section 1252(g) fares no better. The Supreme Court has made clear that § 1252(g) does not "cover[] the universe of deportation claims." *Reno v. American-Arab Anti-Discrimination Committee*, 525 U.S. 471, 482 (1999). It applies narrowly to three discrete actions: the decision or action to "commence proceedings, adjudicate cases, or execute removal orders." *Id.* Judge Chen, relying on *Öztürk*, held that a challenge to unlawful detention does not fall within those "three discrete exercises of prosecutorial discretion." *De La Rosa Izaguirre*, slip op. at 17 (quoting *Öztürk*, 136 F.4th at 397–98). Because Mr. Ayavaca challenges his arrest and detention—not the commencement of proceedings, adjudication of his case, or ultimate decision to execute his removal order—§ 1252(g) is inapplicable.

Nor may the Government invoke §§ 1252(a)(2)(A) or 1252(e). Those provisions concern judicial review of expedited-removal determinations under § 1225(b)(1). The Government affirmatively asserts that Petitioner is presently detained under § 1231(a), not § 1225(b)(1). Judge Chen therefore held that those provisions do not restrict review of a § 1231 arrest-and-detention challenge. *De La Rosa Izaguirre*, slip op. at 18–19. The same conclusion follows here.

In sum, the existence of a final removal order does not place every later arrest and every day of resulting detention beyond judicial review. As *De La Rosa Izaguirre* held after considering and rejecting the same jurisdictional objections raised here: "no provision of Section 1252 bars the Court from considering Petitioner's claims." *Id.* at 19. This Court therefore has jurisdiction under 28 U.S.C. § 2241 to determine whether Respondents possessed lawful authority to arrest Petitioner,

revoke his release, and continue his detention without the process required by the Constitution, the INA, and governing regulations.

### III. THE PETITION IS NOT AN ABUSE OF THE WRIT

Respondents bear the initial burden to plead abuse "with clarity and particularity." *McCleskey v. Zant*, 499 U.S. 467, 494 (1991). They have not shown that the present grounds were previously decided on the merits, much less that this petition is a deliberate misuse of habeas.

First, the custody-review claim was raised. The March 9 reply devoted a separate section to the argument that "ICE'S CUSTODY REVIEWS WERE PERFUNCTORY, NON-INDIVIDUALIZED, AND CANNOT JUSTIFY CONTINUED DETENTION UNDER § 1231(a)(6)." SDNY Reply 9. It argued that the record contained "no individualized analysis" of danger, flight risk, alternatives, community ties, criminal history, medical and mental-health conditions, or the growing length of confinement. Id. at 9–10. It then argued that prolonged confinement without meaningful individualized review violated due process. Id. at 10–11. The Government's own opposition quotes those passages. Opp. 19–20. It cannot simultaneously say the issue was omitted.

Second, Judge Halpern did not decide it. The opinion's merits analysis contains two sections: the regulatory stay made a separate stay unnecessary, and Mr. Ayavaca had not then carried his initial *Zadvydas* burden because the T-visa stay impeded removal. SDNY Op. 5–8. The opinion contains no analysis of § 241.4, no ruling on whether ICE considered danger or flight risk, and no finding that the asserted reviews were individualized or served. Footnote 5 addressed only "passing" APA and Fourth Amendment references in the original petition; it did not mention the developed custody-review arguments in the reply. Id. at 8 n.5.

That ends the same-claim theory. Under *Sanders v. United States*, a prior habeas disposition has controlling weight only when "the same ground" was "determined adversely" and

"the prior determination was on the merits." 373 U.S. 1, 15 (1963). Where a ground was not adjudicated, the court considers it unless the Government proves abuse. Id. at 16–18.

Third, much of this case could not have been litigated earlier. The present petition concerns continued detention after the April 8 judgment, the spring 2026 denial and refiling of T relief, the June 2026 end of BIA proceedings, ICE's post-judgment removal preparations, the July transfer, and the continuing absence of any custody decision after June 2025. It also relies on intervening binding law. *Barbosa da Cunha v. Freden*, 175 F.4th 61, 69, 72–74 (2d Cir. 2026), decided April 28, confirmed that § 1226(a), not § 1225(b)(2)(A), governs interior noncitizens who entered without inspection and were not apprehended at or near the border when detained. And *De La Rosa Izaguirre* was decided after the opposition. A later-arising challenge to the execution of custody is not barred merely because an earlier habeas petition existed. See *James v. Walsh*, 308 F.3d 162, 167–69 (2d Cir. 2002) ("a numerically second petition does not necessarily constitute a 'second' petition" where the later claim could not previously have been raised).

Fourth, the key facts remain in the Government's exclusive possession. *McCleskey* recognizes cause where an "objective factor external to the defense impeded counsel's efforts," including "interference by officials" and the unavailability of the factual basis. 499 U.S. at 493–94. ICE has never produced an adequate record for service for an I-200; the I-203 and supporting worksheet; the notice and reasons for terminating release; the alleged custody decisions; proof of service; the A-file and EARM entries; or victim-screening records. The Government cannot withhold the documents needed to frame a claim and then fault prior counsel for not litigating every defect hidden in those documents. The prejudice is direct: continued physical confinement.

*Esposito v. Ashcroft*, 392 F.3d 549 (2d Cir. 2004), is not comparable. There, the earlier petition had been denied on the merits, the later petition sought to relitigate the same removal issues, and the petitioner had failed to appeal and absconded for years. Id. at 550–51. Mr. Ayavaca

has done the opposite. He appeared for every required check-in, litigated openly, remained continuously in Government custody, and now challenges an unadjudicated and continuing deprivation of liberty.

## IV. RESPONDENTS' OWN DOCUMENTS ESTABLISH THAT RELEASE, NOT MORE PROCESS INSIDE ICE, IS THE PROPER REMEDY

The Government's new declaration supplies the critical fact. ICE released Mr. Ayavaca on May 23, 2024 on an Order of Release on Recognizance under INA § 236, codified at 8 U.S.C. § 1226(a), and later ended that release for one stated reason only: "there was no longer a lack of bed space." Charles Decl. ¶¶ 7, 10. The declaration does not say that he violated a condition, missed a check-in, committed an offense, threatened anyone, concealed his location, or attempted to flee. It says the opposite in practical effect: ICE knew where he was, required him to report, and arrested him when he appeared as directed. Bed availability may explain why the Government wanted a cell. It does not explain why this man lawfully belonged in one.

That matters because the original release was an individualized exercise of custody authority under § 1226(a), not an accidental absence of physical restraint. Once the Government allowed Mr. Ayavaca to live under recognizance and supervision, it could not erase that liberty interest by announcing that a bed had opened. The return contains no contemporaneous revocation decision, no written statement of changed circumstances, no finding of danger, no finding of flight risk, no notice explaining why continued supervision was inadequate, and no record showing that he received an opportunity to respond before being taken into custody. A later litigation declaration that forms were "issued" cannot perform work that the Constitution and the governing regulations required ICE to perform when liberty was taken.

The declaration's reference to an I-203 and I-200 does not cure the defect. Those are administrative custody papers, not a judicial determination that detention was necessary. Nor does

the declaration establish when the I-200 was signed, when it became operative, whether it was served before the arrest, what facts supported it, or whether any officer made the statutory finding required for a warrantless interior arrest under 8 U.S.C. § 1357(a)(2). Mr. Ayavaca came voluntarily to the Government's office. Nothing in the record suggests that he was "likely to escape before a warrant can be obtained." His appearance at the check-in is evidence against that predicate, not for it.

De La Rosa Izaguirre is now the closest authority. There, as here, the Government invoked a final removal order and an administrative warrant to defend an interior arrest. Judge Chen held that the legality of detention turns on whether the Government possessed lawful authority at the time of arrest, not whether it could assemble a justification afterward. The court warned that otherwise ICE could arrest first and seek statutory confirmation later, and concluded: "The Constitution and federal law demand more." De La Rosa Izaguirre, slip op. at 24. The same principle applies here with even greater force because Mr. Ayavaca was not seized during a field operation. He was already complying with ICE supervision and walked into the check-in at the Government's command.

The post-arrest custody record does not save the Government either. **Officer Charles identifies review dates in February, April, and June 2025 and a March interview, but Respondents have not produced the decisions themselves. Charles Decl. ¶¶ 21–23. There is no worksheet, evidence summary, signature, notice, proof of service, danger analysis, flight-risk analysis, or explanation of alternatives. There is no identified review for the thirteen months after June 2025.** The absence is especially striking because the Government knew that Mr. Ayavaca had no criminal history, had complied with reporting, had a fixed address, and was pursuing a T visa as a trafficking victim. **If those reviews were real and individualized, the**

**contemporaneous documents should show it. If the documents do not exist, a declaration cannot invent the missing process.**

The Government also cannot avoid this problem by moving among detention statutes. Its own evidence says the initial release was under § 1226(a). Charles Decl. ¶ 7. *Barbosa da Cunha v. Freden* later confirmed that § 1226(a), not § 1225(b)(2)(A), governs interior noncitizens who entered without inspection and were not apprehended at or near the border when taken into custody. 175 F.4th 61, 69, 72–74 (2d Cir. 2026). And this Court held in *Abreu v. Genalo* that detention under an inapplicable statutory track violates due process because, "[i]f Respondents wish to detain someone like Petitioner, they would have to follow some other provision." No. 26-CV-1181 (SJB), Dkt. 8, slip op. at 3 (E.D.N.Y. Mar. 4, 2026). Whether Respondents call the present detention § 1226 or § 1231, they must prove compliance with the process attached to the statute they invoke. They have not done so under either.

## V. ICE NEVER SHOWED THAT IT CONSIDERED THE TRAFFICKING EVIDENCE

ICE also had repeated notice that Mr. Ayavaca was a trafficking victim. Directive 11005.3, in force at the November 2024 arrest, required officers to look for trafficking indicia, consider victim status as a positive discretionary factor in custody, document the inquiry, and recognize that conduct caused by force, fraud, or coercion does not erase victim status. The T application was filed the next day. By the February, March, April, and June 2025 reviews ICE says it conducted, USCIS had made a bona fide determination and ICE indisputably knew of the victim-based case. Directive 11005.4, effective January 30, 2025, required continued compliance with 8 U.S.C. § 1367 and consultation through the Field Office Director and OPLA before enforcement against known applicants or beneficiaries.

Respondents produce no screening, consultation, approval, EARM entry, referral, or custody analysis reflecting those obligations. They also produce no assessment of PTSD, trauma,

or alternatives to confinement. Mr. Ayavaca is now filing a new T petition. He does not ask this Court to adjudicate that petition or review the removal order. The filing matters because it reinforces what his conduct already proves: he has a powerful reason to remain available, pursue lawful status, cooperate with counsel and law enforcement, and appear when directed. Twenty months in custody while pursuing that process is conduct inconsistent with flight.

The prior removal proceedings provide context, not a separate claim for review. Mr. Ayavaca was initially pro se, was given a short asylum deadline, retained counsel just before the removal order, and later sought reopening while explaining trafficking-related trauma and PTSD. The Court need not revisit those rulings to recognize the central custody point: ICE repeatedly possessed information requiring a careful, victim-centered, individualized decision and has produced no contemporaneous proof that it made one.

## **VI. THE UNLAWFUL ARREST AND UNEXPLAINED REVOCATION REQUIRE RELEASE**

The Government treats the passage of time and the existence of a removal order as though they can wash away the original defect. They cannot. Mr. Ayavaca has been confined since November 14, 2024—more than twenty months—without a produced contemporaneous decision explaining why his compliant recognizance release had to end, why supervision was inadequate, or why detention remained necessary. Civil detention cannot be sustained by institutional inertia. *Zadvydas v. Davis* construes § 1231(a)(6) to authorize confinement only for the period "reasonably necessary to bring about that alien's removal." 533 U.S. 678, 689, 699–701 (2001). But even foreseeable removal does not validate an unlawful arrest, cure a procedurally defective revocation, or replace the individualized decisions the law requires.

Respondents now say they possess a passport and attempted to transport Mr. Ayavaca on July 5, 2026, but an aircraft malfunction interrupted the trip. Opp. 4, 22–23. That assertion may

bear on the narrow Zadvydas foreseeability question. It does not answer the claim before this Court: whether ICE lawfully transformed a compliant supervisee into a detainee in November 2024 and then kept him confined without producing the required custody record. *De La Rosa Izaguirre* and many of this Court's own decisions squarely reject the idea that later developments can retroactively authorize an arrest that lacked a lawful basis when made. Slip op. at 20–25.

Release is therefore not a windfall and not an intrusion into removal proceedings. It restores the last lawful custody status reflected in the Government's own documents: release on recognizance and supervision. Judge Chen ordered precisely that remedy after finding an immigration arrest and detention unlawful, directing release without electronic monitoring and prohibiting re-detention unless the Government first demonstrated lawful authority. De La Rosa Izaguirre, slip op. at 27–28. This Court reached the same remedial principle in *Abreu,* provisionally granting the writ where the Government had used the wrong detention authority. The writ exists to end unlawful custody, not merely to order the jailer to create the missing paperwork after the fact

## CONCLUSION

The Court should deny Respondents' request to dismiss or transfer, reject the abuse-of-the-writ defense, and grant the writ. Respondents' own documents show that Mr. Ayavaca was released under § 1226(a), complied with supervision, and was re-detained because a bed became available—not because he became dangerous, violated release, or threatened to flee. They have produced no contemporaneous revocation decision and no meaningful custody record capable of justifying twenty months of confinement. Under De La Rosa Izaguirre and Abreu, the proper remedy is immediate release without an ankle monitor or comparable surveillance, with no re-detention absent advance leave of Court and proof of compliance with all applicable constitutional, statutory, and regulatory requirements.

Dated: July 17, 2026
White Plains, New York

Respectfully submitted,

s/ S. Michael Musa-Obregon

S. Michael Musa-Obregon
MUSA-OBREGON LAW P.C.
140 Grand Street, Suite 307
White Plains, NY 10601
michael@musa-obregon.com
718-803-1000

Counsel for Petitioner

**CERTIFICATE OF COMPLIANCE**

I certify that this reply memorandum contains 3,394 words, excluding the caption, signature block, and this certificate, and therefore complies with Local Civil Rule 7.1(c).

s/ S. Michael Musa-Obregon

S. Michael Musa-Obregon